## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on September 15, 2023**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL NO.** |
| | : | |
| v. | : | **GRAND JURY ORIGINAL** |
| | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **BAOXIA LIU,** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| a/k/a "Emily Liu," | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(Unlawful Export of U.S.-Origin Goods to** |
| **YIU WA YUNG,** | : | **(Iran)** |
| | : | |
| a/k/a "Stephen Yung," | : | **18 U.S.C. § 554** |
| | : | **(Smuggling Goods from the United** |
| | : | **(States)** |
| **YONGXIN LI,** | : | |
| | : | **31 C.F.R. Part 560** |
| a/k/a "Emma Lee," | : | **(Iranian Transactions and Sanctions** |
| | : | **(Regulations)** |
| | : | |
| **and** | : | **13 U.S.C. § 305** |
| | : | **(Submitting False or Misleading Export** |
| **YANLAI ZHONG,** | : | **(Information)** |
| | : | |
| a/k/a "Sydney Chung," | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting)** |
| | : | |
| Defendants. | : | **Criminal Forfeiture:** |
| | : | **18 U.S.C. § 981(a)(1)(C); 13 U.S.C.** |
| | : | **§ 305(a)(3); 28 U.S.C. § 2461(c); and 21** |
| | : | **U.S.C. § 853(p).** |

## <u>INDICTMENT</u>

The Grand Jury charges that:

## INTRODUCTION

At times material to this Indictment:

## Background

1.        These charges arise from an illicit scheme by Defendants BAOXIA LIU ("LIU"), YIU WA YUNG ("YUNG"), YONGXIN LI ("LI"), and YANLAI ZHONG ("ZHONG"), acting through companies based in the People's Republic of China ("PRC" or "China"), to procure U.S.-origin dual-use goods for end users in Iran, in violation of U.S. export control and sanctions laws. The ultimate end users in Iran were entities connected to Iran's Islamic Revolutionary Guard Corps ("IRGC") that manufactured and produced products for Iran's military programs.

2.        Since at least 2007, LIU, YUNG, LI, and ZHONG have conspired together and with others to use PRC-based companies to procure dual-use commodities directly from U.S.-based companies for the ultimate benefit of end users in Iran.  LIU, YUNG, LI, and ZHONG routinely misrepresented the ultimate end users of these U.S.-origin commodities and caused the reexport of these commodities from China to Iran.   The procured dual-use commodities included products that could be utilized in the production of unmanned aerial vehicles ("UAVs"), ballistic missile systems, aerospace products, and other military systems.

3.        At no time did LIU, YUNG, LI, ZHONG, or any of their PRC-based companies apply for or obtain authorization or the required license from the Treasury Department's Office of Foreign Assets Control ("OFAC") for the transactions alleged herein.  Moreover, in procuring U.S.-origin goods, LIU, YUNG, LI, and ZHONG intentionally concealed that the ultimate end users were Iranian entities and that the ultimate destination was Iran.  LIU, YUNG, LI, and ZHONG intentionally deceived U.S. companies and fraudulently induced U.S. companies to ship products to China under false pretenses.

4.        As a result, thousands of U.S.-origin goods with military applications that were subject to U.S. export controls were unlawfully exported to Iran.

The IRANIAN ENTITIES

5.      The Ministry of Defense and Armed Forces Logistic ("MODAFL") was Iran's defense ministry and part of the country's executive branch.  MODAFL was responsible for defense research, development, and manufacturing to include Iran's missile and nuclear programs. MODAFL supervised Iran's development and production of missiles, weapons, and military aerial equipment to include UAVs.  On October 25, 2007, the U.S. Department of State designated MODAFL pursuant to Executive Order 13382 for its involvement in the proliferation of weapons of mass destruction.  72 Fed. Reg. 71991 (Dec. 19, 2007).

6.      SHIRAZ ELECTRONICS INDUSTRIES ("SEI") was an appliance, electrical, and electronics manufacturing company headquartered in Iran that produced radar and electronic equipment for the Iranian military; repaired Iranian military equipment; and worked on products for Iran's avionics, naval radar, and ballistic missile programs.   On September 17, 2008, SEI was sanctioned for being owned and controlled by MODAFL and for its involvement in the proliferation of weapons of mass destruction and was added to OFAC's Specially Designated National and Blocked Persons ("SDN") List pursuant to Executive Order 13382.   73 Fed. Reg. 64008 (Oct. 28, 2008).   SEI used affiliates for procurement transactions following the imposition of sanctions.

7.      RAYAN ROSHD AFZAR ("RAYAN ROSHD") was a technology company with ties to the IRGC and MODAFL that was headquartered in Iran.  RAYAN ROSHD produced technical components for Iran's UAV program; sought to repair Iranian military equipment; and worked to produce software for the Iranian aerospace program.  On July 18, 2017, RAYAN ROSHD was sanctioned for providing support to the IRGC and was added to OFAC's SDN List pursuant to Executive Order 13382.   82 Fed. Reg. 33943 (Jul. 21, 2017).   RAYAN ROSHD used

aliases such as Hava Pishran Sazeh Sepehr Co. Ltd. ("HPSS") in procurement transactions following the imposition of sanctions.

The Defendants

8.      Defendant BAOXIA LIU ("LIU"), also known as "Emily Liu," was a resident and citizen of the PRC who had no known residence or last known residence in the United States.   LIU held herself out as a representative of Abascience Tech Company LTD ("ABASCIENCE"), Abasic Tech Co., LTD ("ABASIC"), Sanestar China Limited ("SANESTAR"), Sunway Tech Co., LTD ("SUNWAY"), Sunray Global Technology Company Limited ("SUNRAY"), Raybeam Optronics Co. ("RAYBEAM"), and Rayponents Technology Co. Ltd ("RAYPONENTS").   On July 18, 2017, OFAC sanctioned LIU and four entities, including ABASCIENCE, SUNWAY, and RAYBEAM, and added them to its SDN List pursuant to Executive Order 13382 for their proliferation activities on behalf of SEI.   82 Fed. Reg. 33943 (Jul. 21, 2017).

9.      Defendant YIU WA YUNG ("YUNG"), also known as "Stephen Yung," was a resident and citizen of the PRC who had no known residence or last known residence in the United States.   YUNG held himself out as a representative of ABASCIENCE, ABASIC, and SANESTAR.

10.     Defendant YONGXIN LI ("LI"), also known as "Emma Lee," was a resident and citizen of the PRC who had no known or last known residence in the United States.   LI held herself out as a representative of ABASCIENCE, SANESTAR, SUNWAY, and RAYBEAM.

11.     Defendant YANLAI ZHONG ("ZHONG"), also known as "Sydney Chung," was a resident and citizen of the PRC who had no known or last known residence in the United States. ZHONG held himself out as a representative of ABASCIENCE, SANESTAR, and Eponents Technology Co. ("EPONENTS").

The PRC ENTITIES

12.     ABASCIENCE was a PRC-based corporation that advertised itself as a professional supplier of electronic components in the international market with many years of experience in the sales of integrated circuits.   ABASCIENCE claimed to have long-term cooperation arrangements with many well-known foreign enterprises.   On July 18, 2017, OFAC sanctioned ABASCIENCE and two of its Iranian shareholders, one of whom also served as the chairman of the board for RAYAN ROSHD, and added them to its SDN List.   82 Fed. Reg. 33943 (Jul. 21, 2017).

13.     ABASIC was a PRC-based corporation that claimed to be involved in network technology development, technical advice and services, sales of electronic products, and the export and import of goods.

14.     SANESTAR was a PRC-based corporation that held itself out as an international purchaser and trading company in Hong Kong.   SANESTAR claimed to purchase products such as lamps, lighting equipment, carpets and tapestries, utensils, kitchenware and tableware, and other commodities.

15.     SUNWAY was a PRC-based corporation that claimed to be engaged in sales of electronic devices, communication equipment, auto parts, mechanical equipment, and other such products.   SUNWAY advertised its products as widely used in aerospace, navigation, automobiles, oil fields, mining, transportation, communications, and other such industries.   On July 18, 2017, OFAC sanctioned SUNWAY and added it to its SDN List.   82 Fed. Reg. 33943 (Jul. 21, 2017).

16.     SUNRAY was a PRC-based global technology company registered in Hong Kong. One of SUNRAY's Iranian directors ("Iran Person 1") also served as RAYAN ROSHD's

5

Chairman of the Board and was personally sanctioned and added to OFAC's SDN List on July 18, 2017.  82 Fed. Reg. 33943 (Jul. 21, 2017).

17.     RAYBEAM was a PRC-based corporation that claimed to specialize in the research and development, production, and sales of infrared thermal imaging products.  RAYBEAM advertised its products for use in outdoor sports, wetland protection, fire rescue, police and law enforcement, border and coastal defense, national security, and other fields.  Iran Person 1, who served as one of SUNRAY's directors and RAYAN ROSHD's Chairman of the Board, also served as one of RAYBEAM's board members.  On July 28, 2017, OFAC sanctioned RAYBEAM and added it to its SDN List.  82 Fed. Reg. 33943 (Jul. 21, 2017).

18.     RAYPONENTS was a PRC-based technology company registered in Hong Kong.

19.     EPONENTS was a PRC-based corporation that advertised itself as a professional importer of high-precision motors and drive systems, aviation products, military products, high-precision connectors, sensors, relays, integrated circuits, switches, military and civilian gyroscopes, and other such products.  EPONENTS claimed to import semiconductors and connectors from U.S.-based companies.

20.     ABASCIENCE, ABASIC, SANESTAR, SUNWAY, SUNRAY, RAYBEAM, RAYPONENTS, and EPONENTS were all front companies and alter ego companies used interchangeably in LIU's procurement network.

21.     PRC Company 1 was a PRC-based corporation that advertised itself as a supplier of top-quality components for industrial, military, medical, aerospace, and consumer applications. PRC Company 1 claimed to have established strategic sourcing relationships with multiple U.S.-based companies.

The U.S. Companies

6

22.     U.S. Company A was a distributor of U.S.-origin and foreign-manufactured electronic components that was headquartered in Minnesota.  U.S. Company A sold dual-use products that had both civilian and military applications.

23.     U.S. Company B was a manufacturer of filament winding equipment that was headquartered in Wisconsin.  Filament winding machines can be used to create other military, defense, and engineering components, such as large blades used in wind turbines.

24.     U.S. Company C was a manufacturer of components and solutions for a wide range of telecommunications products; its parent company was headquartered in South Carolina.  U.S. Company C sold dual-use products that had both civilian and military applications.

25.     U.S. Company D was a manufacturer of high-performance magnetic components that was headquartered in Illinois.  U.S. Company D manufactured dual-use products that had both civilian and military applications.

26.     U.S. Company E was a distributor of electronic components and fasteners that was headquartered in California.  U.S. Company E sold dual-use products that had both civilian and military applications.

27.     U.S. Company F was a distributor of electronic components and computer products that was headquartered in Colorado.  U.S. Company F sold dual-use products that had both civilian and military applications.

28.     U.S. Company G was a manufacturer of analog, mixed-signal and digital signal processing integrated circuits used in electronic equipment that was headquartered in Massachusetts.  U.S. Company G manufactured dual-use products that had both civilian and military applications.

29.     U.S. Company H was a producer of electronic and fiber optic connectors, cable and interconnect systems that was headquartered in Connecticut.  U.S. Company H manufactured dual-use products that had both civilian and military applications.

30.     U.S. Company I was a producer of power electronic components that was headquartered in New York.  U.S. Company I manufactured dual-use products that had both civilian and military applications.

31.     U.S. Company J was manufacturer of radio frequency power transistors that was headquartered in Rhode Island.  U.S. Company J manufactured dual-use products that had both civilian and military applications.

32.     U.S. Company K was a designer and manufacturer of semiconductors and integrated circuits that was headquartered in Texas.  U.S. Company K manufactured dual-use products that had both civilian and military applications.

33.     U.S. Company L was a manufacturer of modular power components that was headquartered in Massachusetts.  U.S. Company L manufactured dual-use products that had both civilian and military applications.

34.     U.S. Company M was a supplier of radio frequency, resistors, and microwave components that was headquartered in California.  U.S. Company M sold dual-use products that had both civilian and military applications.

35.     U.S. Company N was a supplier of electro-mechanical and electronic components that was headquartered in Maryland.  U.S. Company N sold dual-use products that had both civilian and military applications.

36.     U.S. Company O was a supplier of engineered connectors and cable solutions that was headquartered in Pennsylvania.  U.S. Company O sold dual-use products that had both civilian and military applications.

## STATUTES AND REGULATIONS

### The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations

37.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, authorized the President of the United States to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued executive orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

38.     On March 15, 1995, the President issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  The President subsequently issued Executive Orders 12959 and 13059 (collectively, with Executive Order 12957, the "Executive Orders") clarifying the original declaration of a national emergency and imposing a comprehensive trade and financial embargo on Iran.   Since 1997, the President has continued the national emergency with respect to Iran.

39.     To implement the Executive Orders, OFAC promulgated the Iranian Transactions Regulations, which were subsequently renamed the Iranian Transactions and Sanctions Regulations ("ITSR") (31 C.F.R. Part 560).   With certain limited exceptions not applicable here,

absent prior authorization or a license from OFAC, the ITSR prohibit, among other things: (1) the export, reexport, sale, or supply, directly or indirectly, of any goods, technology, or services from the United States, or by a U.S. person wherever located, to Iran; and (2) the engagement by a U.S. person in any transaction or dealing in or related to goods, technology, or services for export, reexport, sale, or supply, directly or indirectly, to Iran.   These regulations further prohibit any transaction that evades or avoids, or has the purpose of evading or avoiding, any of the prohibitions contained in the ITSR, including the unauthorized export of goods from the United States to a third country if the goods are intended or destined for Iran.   *See* 31 C.F.R. §§ 560.203-560.206.

**Export and Shipping Records**

40.     Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs and Border Protection ("CBP").

41.     The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration ("SED")) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States.   Exporters or their authorized agents are required to file accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more.   The EEI also is required regardless of the value of the goods if the goods require an export license.   15 C.F.R. § 30.2, 758.1.

42.     A material part of the EEI and AES, as well as other export filings, is information concerning the end user and ultimate destination of the export.   The identity of the end user may

determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

43.     The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the EEI and AES aid in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments prior to exportation.    15 C.F.R. § 30.1(b).

## JURISDICTION AND VENUE

44.     Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia.   Pursuant to Title 18, United States Code, Section 3237, venue is proper in the District of Columbia.

45.     Additionally, certain of the offenses alleged herein were begun and committed outside of the jurisdiction of any particular state or district of the United States.   For those offenses, pursuant to Title 18, United States Code, Section 3238, venue is proper in the District of Columbia.

### COUNT ONE
**(Conspiracy to Commit Offenses Against the United States)**

### THE CONSPIRACY

46.     Between at least in or around May 2007 and continuing through in or around July 2020, Defendants

**BAOXIA LIU,
YIU WA YUNG,
YONGXIN LI, and
YANLAI ZHONG,**

11

and others known and unknown to the Grand Jury, within the venue of the United States District Court for the District of Columbia, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit offenses against the United States, more particularly:

    a.  to defraud the United States government involving the use of deceit, craft, trickery, and dishonest means by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export and supply of goods from the United States to Iran without having first obtained the required authorization or license from OFAC;

    b.  to knowingly and willfully export, reexport, sell, supply, and cause to be exported goods and technology, directly and indirectly, from the United States to Iran, including through China, without having first obtained authorization or the required license from OFAC, located in the District of Columbia, in violation of Title 50, United States Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Part 560 (ITSR);

    c.  to knowingly fail to file and submit false and misleading export information through the EEI and the AES, and cause the same, in violation of Title 13, United States Code, Section 305; and

    d.  to fraudulently and knowingly export and send and attempt to export and send from the United States merchandise, articles, and objects contrary to laws and regulations of the United States, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation

contrary to laws and regulations of the United States, in violation of Title 18, United States Code, Section 554.

### Objects of the Conspiracy

47.    The objects of the conspiracy were:

    a.  to acquire U.S.-origin goods from the United States, that is, electronic components used in missile and aerospace industries that were manufactured and sold in the United States, on behalf of end users in Iran;

    b.  to export items from the United States directly and indirectly to Iran, including through China;

    c.  to conceal the prohibited activities and transactions from detection by the U.S. Government so as to avoid penalties and disruption of the illegal activities;

    d.  to profit through these illegal activities; and

    e.  to evade the prohibitions and licensing requirements of the IEEPA and ITSR.

### Manner and Means of the Conspiracy

48.    The manner and means by which the Defendants and conspirators sought to accomplish the objects of the conspiracy included the following:

    A.    The conspirators began planning and acting outside of the United States to acquire goods from the United States to include electronic components, connectors, semiconductors, transistors, amplifiers, and other goods with military applications for the purpose of providing those goods to end users in Iran;

    B.    The conspirators used email accounts, messaging applications, and other forms of electronic communication to communicate with one another and with other individuals located in the United States, China, Iran, and elsewhere;

C.      The conspirators purchased goods from companies located in the United States, on behalf of other conspirators and customers in Iran;

D.      The conspirators caused goods to be shipped from the United States to China and Iran;

E.      The conspirators transported those goods to Iran, typically by exporting or causing the goods to be exported to China for eventual delivery to customers in Iran. Contrary to material representations made to U.S. companies by the conspirators, Iranian entities were the ultimate end users of the goods purchased by the conspirators;

F.      The conspirators used front companies and purported legitimate companies in China to cause the shipment of U.S.-origin goods to Iran through China;

G.      The conspirators intentionally concealed from companies and shippers located in the United States the ultimate end use and end users of the purchased U.S.-origin goods;

H.      The conspirators intentionally provided false and fictitious shipping destinations and end users to U.S. companies for use in an SED;

I.      The conspirators caused and attempted to cause U.S.-origin goods to be exported from the United States to individuals and entities in Iran without obtaining authorization or the required license from OFAC, which was located in the District of Columbia; and

J.      The conspirators caused international monetary instruments to be sent from China and elsewhere to the United States to pay for the U.S.-origin goods that were being purchased for illegal export to Iran.

**Overt Acts**

14

49.    In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed or caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

### Initial Targeting of U.S. Companies

a.   On or about May 15, 2007, LIU contacted U.S. Company A under the company names ABASCIENCE and ABASIC for the purpose of procuring digital integrated circuits capable of high precision and throughput for high resolution applications on behalf of end users in Iran.

b.   On or about March 2009, ZHONG contacted U.S. Company B under the company name ABASCIENCE for the purpose of procuring a multi-axis filament winder on behalf of end users in Iran.

c.   On or about March 13, 2010, LIU contacted U.S. Company A under the company names ABASCIENCE and ABASIC for the purpose of procuring keypad interfaces on behalf of end users in Iran.   YUNG was listed as the destination point of contact, doing business on behalf of SANESTAR.   On or about April 20, 2010, U.S. Company A fulfilled LIU and YUNG's procurement request.

d.   On or about November 5, 2010, LIU contacted U.S. Company A under the company name ABASIC for the purpose of procuring a variety of electronic parts to include U.S. manufactured products, on behalf of end users in Iran.   SANESTAR was listed as the destination company.   U.S. Company A fulfilled LIU's procurement request.

e.   On or about November 8, 2010, LIU contacted U.S. Company A under the company names ABASCIENCE and ABASIC for the purpose of procuring 3,000 voltage

suppressors capable for use in communications systems and various control process systems, and manufactured by a U.S. company, on behalf of end users in Iran.    On or about November 9, 2010, U.S. Company A fulfilled LIU's procurement request.

f.    On or about February 16, 2011, LIU contacted U.S. Company A under the company name ABASIC for the purpose of procuring twenty-five digital compasses manufactured by a U.S. company, on behalf of end users in Iran.

g.    On or about March 14, 2011, LIU contacted U.S. Company A under the company name ABASIC for the purpose of procuring 250 metal oxide semiconductor field effect transistor drivers, manufactured by a U.S. company, on behalf of end users in Iran.    On or about March 14, 2011, U.S. Company A fulfilled LIU's procurement request.

**Transaction Set 1: June 2014**

h.    On or about June 6, 2014, U.S. Company C received a wire transfer from ABASIC via a financial institution in the PRC, to U.S. Company C's bank in the United States as payment for 112 units of fixed resistors.

i.    On or about June 11, 2014, YUNG emailed LIU and explained that he had received a shipment of U.S. Company C parts.    YUNG provided LIU a commercial sales invoice from U.S. Company C identifying the purchase of 112 units of fixed resistors by ABASIC.

j.    On or about June 12, 2014, LIU emailed YUNG and instructed him to keep the shipped parts and await further shipping instructions.

k.    On or about June 26, 2014, LIU instructed YUNG to combine the U.S. Company C parts with other products into one carton, and to insert an attached invoice inside

the carton identifying ABASCIENCE as the shipper and an Iranian end user as the consignee.

l.   On or about June 26, 2014, LIU instructed YUNG to ship the carton containing U.S. Company C parts from the PRC to Iran to an Iranian end user by way of a Hong Kong-based logistics company.

### Transaction Set 2: August – October 2014

m.   On or about August 21, 2014, a known Iranian individual (hereinafter, "Co-conspirator 1") emailed LIU regarding a quotation for U.S. Company D items.

n.   On or about September 28, 2014, LIU and Co-conspirator 1 discussed payment for the U.S. Company D items and other electronic parts.   LIU acted under the company name ABASIC.

o.   On or about September 29, 2014, Co-conspirator 1 paid LIU in exchange for LIU shipping the U.S. Company D items and other electronic parts.

p.   On or about October 11, 2014, LIU shipped the U.S. Company D items and other electronic parts from the PRC to Co-conspirator 1 located in Iran.

q.   On or about October 17, 2014, Co-conspirator 1 confirmed receipt of the U.S. Company D items and other electronic parts to LIU.

r.   On or about October 20, 2014, LIU confirmed receipt of additional payment from Co-conspirator 1 for the U.S. Company D items and other electronic parts.

### Transaction Set 3: September 2016 – June 2017

s.   On or about September 27, 2016, a SUNWAY representative also acting on behalf of ABASIC contacted U.S. Company E for the purpose of procuring dowel pins and military standard fasteners on behalf of end users in Iran.   The SUNWAY

representative explained to U.S. Company E that SUNWAY was a new department of overseas purchasing for ABASCIENCE.

t.  On or about September December 27, 2016, a SUNWAY representative also acting on behalf of ABASIC again contacted U.S. Company E for the purpose of procuring dowel pins and military standard fasteners on behalf end users in Iran.

u.  On or about January 5, 2017, the SUNWAY representative signed a special order confirmation form provided by U.S. Company E and provided a shipment address with SANESTAR and ABASCIENCE listed as the beneficiaries.   The SUNWAY representative included LIU on the email communications and listed YUNG as the beneficiary point of contact.

v.  On or about February 16, 2017, YUNG confirmed to LIU the receipt of U.S. Company E parts by SANESTAR.

w.  On or about June 15, 2017, LIU contact YUNG to inquire about a goods list from U.S. Company E.

x.  On or about June 16, 2017, YUNG confirmed to LIU and LI that he had received a carton of U.S. manufactured Heat Shrink Boots, which are components designed to form a tight bond around wires and cables, from U.S. Company E from Illinois.

y.  On or about June 29, 2017, the U.S. manufactured Heat Shrink Boots procured from U.S. Company E were shipped from the PRC to an Iranian end user on behalf of LIU.

**Transaction Set 4: October 2017**

z.   On or about September 30, 2017, LI purchased four military specification circular connectors from U.S. Company F.   YUNG and SANESTAR were listed as ultimate consignee for the circular connectors sold by U.S. Company F.

aa.   On or about October 16, 2017, YUNG informed LI via email that he had received a carton of goods from PRC Company 1.   On the same date, LI responded to both YUNG and LIU that another package would arrive at the factory and provided shipment information that included U.S.-origin parts distributed by U.S. Company F.

bb.   On or about October 16, 2017, YUNG informed LI that he received a box of parts to include military specification circular connectors from U.S. Company F on behalf of SANESTAR, which along with YUNG was listed as the ultimate consignee and end user.   An invoice from U.S. Company F contained language explaining that the items were controlled by the U.S. Government and were authorized for export only to the country of ultimate destination for use by the ultimate consignee or end user(s), which were identified as YUNG and SANESTAR.

cc.   On October 24, 2017, YUNG advised LI and LIU via email that he received another box of parts.   The email included an attachment with a packing list on letterhead of a known Hong Kong-based electronics company (hereinafter "Hong Kong Company 1").   SUNRAY was listed as the receiving company in Hong Kong, with YUNG identified as the point of contact.

dd. On October 25, 2017, LI emailed YUNG and LIU, and told YUNG to ship the PRC Company 1, Hong Kong Company 1, and U.S. Company F goods to an Iranian end user.   An included invoice listed LIU as the consignor along with ABASCIENCE.

ee. On or about October 25, 2017, LIU signed a certification form as the consignor claiming that the U.S. Company F parts were of Chinese-origin.

ff. On or about October 25, 2017, YUNG shipped the PRC Company 1, Hong Kong Company 1, and U.S. Company F parts to RAYAN ROSHD.

**Transaction Set 5: February 2018**

gg. On or about February 8, 2018, LI emailed YUNG and LIU to advise them that a package would arrive the next day from PRC Company 1.   LI asked that the goods be shipped to one of the IRANIAN ENTITIES.   An attachment to the email on PRC Company 1 letterhead listed over 1,000 components to include products from U.S. Company G, U.S. Company H, and U.S. Company I.   An additional attachment to the email included an invoice that stated the goods were to be shipped to RAYAN ROSHD in Tehran, Iran, and listed YUNG and SANESTAR as the consignor.

hh. On or about February 12, 2018, YUNG confirmed to LI and LIU that he had received a carton of parts from PRC Company 1 and confirmed that the parts were being sent to an Iranian end user on the same date.   YUNG provided an air waybill number to LI and LIU.

**Transaction Set 6: November 2018**

ii.  Between on or about November 2, 2018, and November 20, 2018, LI sent three emails to YUNG and LIU advising them of multiple packages being shipped to YUNG's factory in the PRC.

jj.  On or about November 20, 2018, YUNG sent three separate emails to LI and LIU confirming receipt of multiple packages from PRC Company 1 and a Taiwan-based technology company.   YUNG attached invoices from PRC Company 1 that contained a list of foreign and U.S.-origin products from U.S. Company G, U.S. Company J, and U.S. Company K.   The shipment receiver on the invoices was listed as RAYAN ROSHD.

kk.  On or about November 24, 2018, LI emailed YUNG and LIU, and instructed YUNG to repackage a small package into a big carton to be shipped to her customer.

ll.  On or about November 24, 2018, YUNG emailed LI and LIU to advise that the carton had been shipped.

mm. On or about November 28, 2018, LI emailed YUNG and LIU and asked that goods be delivered to a particular address.   An attachment to the email identified a receiving address associated with Imam Khomeini International Airport in Tehran, Iran.

### Transaction Set 7: June 2019 – September 2019

nn.  On or about June 19, 2019, a known co-conspirator (hereinafter "Co-conspirator 2") emailed YUNG and LIU in her capacity as a SUNWAY employee regarding a package form with a tracking number.   Co-conspirator 2 instructed YUNG to check the shipping list and cross out the company name with a black marker for

21

each package.    An attachment to the email contained a shipping list with multiple parts numbers of various quantities.

oo.  On or about June 25, 2019, YUNG emailed LIU and Co-conspirator 2 that he received one carton of parts from PRC Company 1.    A photograph of parts listed on PRC Company 1 letterhead was attached.    The photograph of parts included U.S.-origin products from U.S. Company G and U.S. Company H.

pp.  On or.about June 26, 2019, Co-conspirator 2 advised YUNG and LIU via email that delivery instructions had changed and that she would send a new address once received.

qq.  On or about August 9, 2019, Co-conspirator 2 emailed YUNG and LIU to advise that a package had been sent to them.    Co-conspirator 2 identified parts numbers in the package as being U.S. Company L components.

rr.  On or about August 12, 2019, YUNG advised LIU and Co-conspirator 2 via email that he had received a carton of parts.    Co-conspirator 2 responded that she would confirm delivery and provide the delivery address to forward the goods.

ss.  On or about August 29, 2019, Co-conspirator 2 emailed YUNG and LIU and asked them to prepare two cartons of goods for delivery.    Co-conspirator 2 provided instructions that the company name and brand for each package should be crossed out with black marker.

tt.  On or about September 3, 2019, Co-conspirator 2 provided additional instructions to YUNG via email and attached an invoice to the email that identified the delivery address for the goods as an address for an affiliate of SEI in Tehran, Iran with an exportation date of September 2, 2019.

**Falsified EEI**

uu. On or about February 13, 2015, LIU procured a shipment that included numerous flanges and resistors from U.S. Company M on behalf of RAYPONENTS and SANESTAR.

vv. On or about April 15, 2015, LIU procured an additional shipment that included numerous resistors from U.S. Company M on behalf of RAYPONENTS and SANESTAR.   On the same date, the shipment was seized at the border by CBP en route to SANESTAR.

ww. On or about April 28, 2015, LIU certified via a BIS-711 form, titled "Statement by Ultimate Consignee and Purchaser" that the ultimate end user of the April 15, 2015, shipment was RAYPONENTS located in Beijing, China.   This caused U.S. Company M to file a false EEI document with CBP that falsely listed a company in Beijing, China as the ultimate consignee as opposed to an entity in Iran.

xx. Up and until November 3, 2016, LIU contacted U.S. Company M to demand return of the payment made for the April 15, 2015, shipment.

yy. On or about December 29, 2016, a known co-conspirator (hereinafter "Co-conspirator 3") acting on behalf of ABASIC and SANESTAR emailed U.S. Company N with LIU copied to request a quote for toggle switches.   Co-conspirator 3 provided YUNG as the point of contact for SANESTAR.   On or about January 3, 2017, U.S. Company N provided an invoice related to the request for a quote for toggle switches.

zz. On or about January 11, 2017, Co-conspirator 3 provided U.S. Company N with a bank transfer notice with LIU listed as the originator of the funds.   On or about

January 17, 2017, Co-conspirator 3 confirmed to U.S. Company N that LIU was paying for the toggle switches.

aaa. On or about February 5, 2017, Co-conspirator 3 certified an end use/user statement provided by U.S. Company N that the ultimate end user of the toggle switches was an aviation company located in Beijing, China.   This caused U.S. Company N to file a false EEI document with CBP that falsely listed a company in Beijing, China as the ultimate consignee as opposed to one of the IRANIAN ENTITIES or another entity in Iran.

bbb. On or about February 22, 2019, SANESTAR purchased numerous connectors from U.S. Company O for the purpose of procuring the connectors on behalf of the IRANIAN ENTITIES and others for use in Iran.

ccc. On or about February 26, 2019, LI emailed YUNG and LIU to inform them that packages would arrive at the factory from U.S. Company O and PRC Company 1.

ddd. On or about March 19, 2019, LI emailed YUNG and LIU to inform them that another package would arrive from U.S. Company O and asked that she be notified immediately.

eee. On or about March 19, 2019, YUNG emailed LI and LIU to inform them that he received a carton of parts from U.S. Company O and provided an attachment that contained a commercial invoice from Company O for the purchase of numerous connectors with SANESTAR as the listed end user.

fff. On or about March 26, 2019, YUNG emailed LI and LIU packaging information for four cartons that included referenced shipments from PRC Company 1, U.S.

Company O, and two other foreign-based companies.   YUNG requested that LI and LIU arrange air shipment for the cartons.

ggg. On or about March 29, 2019, LI emailed YUNG and LIU and requested that goods be delivered to a designated address.   An email attachment included a specific warehouse for staging deliveries to Imam Khomeini Airport in Tehran, Iran.

hhh. On or about April 10, 2019, YUNG certified via a BIS-711 statement by ultimate consignee and purchaser form that the ultimate end user of the 2019 U.S. Company O shipments was a technology company located in Jiangsu, China.   This caused U.S. Company O to file a false EEI document with CBP that falsely listed a company in Jiangsu, China as the ultimate consignee as opposed to an entity in Iran.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
### (Unlawful Export of U.S.-Origin Goods to Iran)

50.    The factual allegations in Paragraphs 1 through 49 of this Indictment are incorporated and re-alleged by reference herein.

51.    On or about the dates listed below, for each count, in the District of Columbia and elsewhere, Defendants

**BAOXIA LIU,**
**YIU WA YUNG, and**
**YONGXIN LI,**

did knowingly and willfully export, reexport, sell, supply, attempt to export, and cause to be exported goods and technology, as described in each Count below, directly and indirectly, from the United States to Iran, including through China, without having first obtained authorization or the required license from OFAC, located in the District of Columbia, as follows:

| COUNT | EXPORTED ON OR ABOUT DATE | ITEM |
|---|---|---|
| 2 | August 8, 2019 | • V24C36T100BL – Fixed-Ratio DC-DC Converter<br>• MPO28F036M12AL – Non-isolated Regulator |

In violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal

Regulations, Part 560; and Title 18, United States Code, Section 2.

### COUNT THREE
### (Smuggling Goods from the United States)

52.     The factual allegations in Paragraphs 1 through 49 of this Indictment are

incorporated and re-alleged by reference herein.

53.     Between in or about February 2019, through in or about April 2019, in the District

of Columbia and elsewhere, Defendants

**BAOXIA LIU,**
**YIU WA YUNG, and**
**YONGXIN LI,**

did fraudulently and knowingly export and send and attempt to export and send from the United

States components brokered for sale by a U.S. company, and fraudulently and knowingly received,

concealed, bought, sold, and facilitated the transportation, concealment, and the sale of such

merchandise, knowing the same to be intended for exportation contrary to the laws and regulations

of the United States, to wit, Title 50, United States Code, Section 1705; Title 31, Code of Federal

Regulations, Part 560; Title 13, United States Code, Section 305; and Title 15 Code of Federal

Regulations, Part 30 as follows:

| COUNT | EXPORTED ON OR ABOUT DATE | ITEM |
|---|---|---|
| 3 | August 8, 2019 | • V24C36T100BL – Fixed-Ratio DC-DC Converter<br>• MPO28F036M12AL – Non-isolated Regulator |

All in violation of Title 18, United States Code, Sections 554 and 2.

## COUNT FOUR
### (Submitting False or Misleading Export Information)

54.     The factual allegations in Paragraphs 1 through 49 of this Indictment are incorporated and re-alleged by reference herein.

55.     Between in or about February 2019, through in or about April 2019, in the District of Columbia and elsewhere, Defendants

**BAOXIA LIU,**
**YIU WA YUNG, and**
**YONGXIN LI,**

did knowingly and willfully fail to file and submit false and misleading export information through the Electronic Export Information and the Automated Export System in connection with the exported connectors brokered for sale by U.S. Company O, and caused the failure to file and the submission of such false and misleading information, in violation of Title 13, United States Code, Section 305, and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

1.     Upon conviction of any offenses alleged in Counts One through Three of this Indictment, the Defendants shall forfeit to the United States any property real or personal, which constitutes, or is derived from, proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).   The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to these offenses.

2.      Upon conviction of the offense alleged in Count Four of this Indictment, the Defendants shall forfeit to the United States, in addition to any other penalty, any of that person's interest in, security of, claim against, or property or contractual rights of any kind in the goods or tangible items that were the subject of the violation; any of that person's interest in, security of, claim against, or property or contractual rights of any kind in tangible property that was used in the export or attempt to export that was the subject of the violation; and any of that person's property constituting or derived from, any proceeds obtained directly or indirectly as a result of the violation, pursuant to Title 13, United States Code, Section 305(a)(3).   The United States will also seek a forfeiture money judgment for a sum or money equal to the value of any property constituting or derived from, or any proceeds obtained directly or indirectly as a result of, the violation.

3.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third party;

     c.   has been placed beyond the jurisdiction of the Court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), Title 13, United States Code, Section 305(a)(3), and Title 21, United States Code, Section 853(p)).

A TRUE BILL

_____
Foreperson

_____
MATTHEW M. GRAVES
UNITED STATES ATTORNEY